COOKS, Judge.
11 FACTS AND PROCEDURAL HISTORY
Yesterdays of Lake Charles, Inc. (Yesterdays) and Cowboy’s Nightlife, Inc. *691 (Cowboys) were subjected to an allegedly “random” audit on November 3, 2009, by the Calcasieu Parish School System Sales and Use Tax Department (Collector) for a four-year audit including the period from January 1, 2005 through December 31, 2008. These clubs are owned by Mr. C.O. Vallet (Vallet). Vallet opened Cowboy’s in 1991 and Yesterdays in 2001. Cowboy’s catered to the local college crowd and was only open on Thursdays and Saturdays. It had a maximum seating capacity of approximately 1,000. Cowboy’s did not have any bands perform for its customers but offered various promotions, - giveaways, free cover charges and drink specials such as beer-dollar-night on Thursdays. Yesterdays was a smaller club with a capacity of approximately 350, catering largely to an older crowd. It hired bands to attract customers and also offered giveaways, promotions, and incentives to attract customers.
These enterprises were cash businesses. At the end of each business night the managers would count the cash taken in and compare that count to the amount reflected on the registers’ tapes known as “Z-tapes.” The cash was then placed in a safe, on-site, and deposited in the bank on Mondays. From the beginning of these business operations until the Collector’s audit, a period of some twenty years, Val-let routinely provided the deposit receipts and bank statements of these businesses to his CPA as his records for the preparation of federal, state, and local sales tax returns. The State of Louisiana, acting through the Department of Revenue (LDR), never raised any question regarding the subject tax years; and, after conducting its own audit in 2008, found no additional taxes were due by the hclubs. Vallet submitted the same documents to LDR for its audit which included bank statements and deposit slips he provided to the Collector. The parties stipulated Yesterdays reported total sales of $2,249,098.00 for the tax period at issue and paid total sales taxes to the School Board of $107,637.94. Cowboy’s reported annual sales of $3,945,053.00 and paid School Board taxes totaling $188,951.00 for the period at issue. The parties also stipulated, for the same period, Yesterdays paid state sales taxes totaling $89,964.00 and Cowboy’s paid the state $157,801.00.
The Collector claims Vallet’s two businesses were “randomly” selected for audit. The odds that both of Vallet’s clubs were randomly selected for audit out of all such businesses in Calcasieu Parish seem to the clubs’ owner as likely as perhaps, picking the right power ball numbers and winning the Lotto. Nevertheless, the Collector maintains the clubs were randomly selected. The clubs provided the monthly deposit slips and bank statements to the Collector’s auditor as well as copies of the clubs’ federal and state tax returns, but the Collector refused to accept such information as sufficient proof. Purportedly acting under its authority by virtue of La.R.S. 47:337.35, the Collector requested the Clubs agree to a three-month-per-year sample audit of the years in question. The Collector made no indication that it was acting under the provisions of La.R.S. 47:337.28. The Collector’s audit resulted in an increased tax for both clubs with taxes, interest, and penalties for Yesterdays totaling $155,662.95 and for Cowboy’s totaling $49,973.99. The clubs filed suit attacking the final assessments and the methodology used in reaching them.
The trial court ruled in favor of Yesterdays and Cowboy’s, and deferred a ruling on the issue of attorney fees due Plaintiffs. The Collector filed a motion for 13new trial which the trial court denied. At the hearing on the motion for new trial, the court awarded attorney fees to Plaintiffs pursuant to La.R.S. 47:337.13.1(B)(1). The Col *692 lector appeals the trial court judgment. For the reasons stated below we affirm the trial court’s ruling.
ANALYSIS
The Collector asserts the trial court erred as a matter of law in finding the statutory provisions on recordkeeping ambiguous, and in finding the clubs’ bank statements alone without additional documentation were “suitable records” for tax determination under the state tax laws. The Collector also asserts the clubs were required to keep their “Z-tapes” from the registers for the required period of time as suitable records. We disagree. It is undisputed no notices, prior to the subject audits, were sent to the clubs’ owner requiring he keep these records as 'the only suitable financial documentation that would satisfy the Collector in the event of an audit. Further, the taxing authority could have promulgated a “Z-tape only” rule but never did. The first Notice of Assessment for Yesterdays’ tax, dated January 19, 2010, was for $217,190.49 and with interest and penalties totaled $376,088.65. This number was reduced to $115,712.16 in the first Amended Assessment on July 10, 2010, then lowered to $92,362.81 on July 29, 2010, in the second Amended Assessment, and finally assessed at $85,353.60 on August 26, 2010. With interest and penalties the final assessment resulted in a tax bill for Yesterdays totaling $155,662.95. In the Collector’s initial Notice of Assessment for Cowboy’s, issued on January 19, 2010, the amount due was assessed at $219,161.87 and with interest and penalties totaled $366,989.50. The first Amended Assessment dated July 10, 2010 lowered the assessed amount to $56,183.17; the second Amended Assessment again lowered the amount to $35,415.15; and the Final Assessment for LCowboy’s was for $29,292.42. With interest and penalties added to the tax assessed the final total claimed by the Collector for Cowboy’s was $49,973.99.
 The Collector asserts the trial court legally erred in shifting the burden of proof to the Collector by finding that R.S. 47:337.29 is ambiguous. We disagree, and find the record supports the trial court judgment which was not manifestly erroneous nor was it legally incorrect.
[T]ax statutes are to- be interpreted liberally in favor of the taxpayer, and if the statute can reasonably be interpreted more than one way, the interpretation less onerous to the taxpayer shall he adopted. Tarver v. E.I. Du Pont de Nemours and Co., 616 So.2d 216 (La.App. 5 Cir.1993), affirmed 93-1005 (La.3/24/95); 634 So.2d 356.
Clyde Juneau Co., Inc. v. Caddo-Shreve-port Sales and Use Tax Comm’n, 28433, p. 6 (La.App. 2 Cir. 6/26/96), 677 So.2d 610, 613 (emphasis added).
Because these tax statutes provide for the imposition of penalties on a taxpayer found to be in violation of the statutes, they must be strictly construed. Gibbs Constr. Co., Inc. v. State, Dep’t of Labor, 540 So.2d 268 (La.1989). Louisiana Revised Statutes 47:337.29 provides:
A. (1) Every dealer required to make a report and pay any tax under this Chapter shall keep and preserve suitable records of the sales, purchases, or leases taxable pursuant to this Chapter, and such other books of accounts as may be necessary to determine the amount of tax due hereunder, and other information as may be required by the collector; and each dealer shall secure, maintain and keep until the taxes to which they relate have prescribed, a complete record of tangible personal property received, used, sold at retail, distributed, or stored, leased or rented, within the taxing jurisdiction by the[1] said *693 dealer, together with invoices, bills of lading, and other pertinent records and papers as may be required by the collector for the reasonable administration of the tax, and a complete record of all sales or purchases of services taxable as provided in this Chapter until the taxes to which they relate have prescribed.
(2) These records shall be open for inspection to the collector at all reasonable hours.
|fi(3) The collector is authorized to require all dealers who take deductions on their sales tax returns for total sales under the minimum taxable bracket prescribed pursuant to R.S. 47:304 to support their deductions by keeping written or printed detailed records of said sales in addition to their usual books and accounts.
B. Any dealer subject to the provisions of this Chapter who violates the provisions of this Section shall be fined not more than five hundred dollars or imprisoned for not more than sixty days, or both, for any such offense.
The statute refers only to “suitable records,” “other books of accounts,” and “other information as may be required by the collector!!.]” These are all ambiguous, ill-defined terms which give no clear instruction to the taxpayer as to what specific records and/or documents will be acceptable, let alone required, to determine taxes owed in the event of an audit. The Collector could have easily published a list of required records/documents but did not do so until after its assessment of Vallet’s businesses. Moreover, the Louisiana Department of Revenue, the United States Internal Revenue Service, and even the Collector have been satisfied for some twenty (20) years with this taxpayer’s filings based only on the very records he supplied to the Collector in this audit.
Additionally, we note this statute does not require a taxpayer to keep “the best evidence” as the Collector suggests, rather, it requires only “suitable records,” which term is not defined nor made more specific by any promulgations from the Collector prior to these assessments or by any other taxing authority. Evidence submitted at trial demonstrated the Collector has for quite some time been aware that taxpayers, operating a business within the Parish’s jurisdiction, have expressed uncertainty as to what constitutes “suitable records” of sales. In an August 2004 edition of the Calcasieu Parish School System Sales & Use Tax Department publication the taxing authority stated:
| fiMore and more often we find that businesses are not keeping adequate records in accordance with applicable tax laws. For local sales and use tax purposes, R.S. 47:337.29 states that every dealer required to make a report in paying a tax shall keep and preserve suitable records of the sales, purchases, or leases taxable under various local tax ordinances. Dealers may obtain a fairly detailed listing of records customarily maintained by entrepreneurs from their local tax office (soon to be on our website www.calcasieuusalestax.org).
In response to the taxpayers’ uncertainty about the meaning of “suitable records,” the Collector merely recited the same vague language of the state statute and referred them to a non-existent list of suitable records. The Collector offered no evidence or testimony of any actual lists that it had ever published prior to these audits. Additionally, Kathy Pettis (Pettis), the Collector’s former audit supervisor, testified that bank statements, deposit slips, and tax returns are recognized as sales records by the Louisiana Association of Tax Administrators (LATA). The Collector’s own Association uses LATA’s *694 guidelines to teach its representatives how to audit a bar business.
We are also unconvinced by the Collector’s cases cited and note the cases do not support its argument. In Calcasieu Parish School Board v. Parker, 02-339 p. 6 (La.App. 3 Cir. 10/2/02), 827 So.2d 543, 546-47 (emphasis added) we held:
Pursuant to Louisiana Revised Statute 47:309, it is the duty of the retailer to keep and preserve suitable records until the taxes to which they relate have prescribed. Parker cannot now complain that an arbitrary assessment was inequitable when it was his duty to maintain records. With no records to determine what his actual sales were, the School Board had the right to utilize some method of determining what taxable sales Parker had for the audit period. Schwegmann Bros. Giant Super Mkts., Inc. v. Mouton, 309 So.2d 686 (La.App. 4 Cir.1974), writs denied, 310 So.2d 845 (La.1976). We do not find that the method used by the School Board was unconscionable or inequitable.
In Parker, 827 So.2d at 546, unlike in the present case, the taxpayer “could not produce 440 invoices out of a total sequenced number of 616 [invoices].” Thus 17Parker had virtually no records on which a determination could be made. In Schwegmann Bros. Giant Super Markets, Inc. v. Mouton, 309 So.2d 686 (La.App. 4 Cir.1974), writ denied, 310 So.2d 845 (La.1975), the court held Schwegmann’s method of collecting and calculating its sales tax liability “was not in compliance with any of the methods accepted by the Collector.” Id. at 689. Unlike the taxpayer in the present case, Schwegmann’s knew exactly what the acceptable methods were and knew if it desired to use a different method it was required to secure approval from the Collector. Additionally, in Schweg-mann, the only evidence offered to refute the Collector’s audit results, which were based on register tapes of actual sales in the taxpayer’s store on low volume days and high volume days, was the testimony of a Schwegmann’s' executive who admitted:
... [His] lack of knowledge as to the method of how [Schwegmann’s] figure was computed; he relied entirely upon a figure derived in some unknown manner by an unnamed person whose only stated qualification was an unnamed degree from the University of Alabama. It is significant to note Schwegmann offered no audit or other figures of its own to contradict the Collector’s audit, which remained effectively unimpeached.
Id. at 691.
This taxpayer did what he and his CPA had done for years, and what he reasonably understood to be sufficient books and records which included bank statements and deposit slips. If the Collector required businesses such as these clubs to keep their “Z-tapes” then it could have promulgated such a requirement or at least informed taxpayers in writing that only this record would constitute a “suitable record” for tax purposes. It did not. It was simply unfair to ambush them after-the-fact and demand only the production of “Z-tapes” as proof of total sales. The bank deposit method of proof has long been used by the federal government to establish proof of taxes owed by a taxpayer. United States v. Dorsey, 499 Fed. Appx. 176, 178 (3rd Cir.2012). Nothing put Vallet on notice that his method of record keeping, which he used for many years without question and which always proved satisfactory to all taxing authorities, would suddenly become unacceptable to the local taxing authority. The trial court specifically found Vallet did not commit any fraud in declaring the amount of *695 sales. Indeed, the record establishes this taxpayer fully cooperated with the Collector during the audit process and the Collector admitted that the amount of sales shown on the taxpayer’s bank statements and deposit slips were as represented in the taxpayer’s returns.
We also disagree with the Collector’s argument that the trial court committed legal error in finding “the Collector’s arbitrary tax calculation methodology was improper.” The statute does not grant Collectors in this circumstance the authority to make an arbitrary estimate of the clubs’ retail sales during the disputed periods. Louisiana Revised Statutes 47:337.28(A) provides in pertinent part “or in the case the dealer makes a grossly incorrect report or a report that is false or fraudulent, the collector shall make an estimate of the retail sales of such dealer for the taxable period...” (Emphasis added). Inadequate, generally speaking, and incorrect are not terms synonymous with fraud or grossly incorrect. The LDR did not think the taxpayer’s reported income was “incorrect,” much less “inadequate,” or more to the point, inaccurate. As the taxing authority for the state, it was satisfied that the records supplied by the taxpayer in support of its state filings were satisfactory and resulted in no adjustment in the state’s audit. Even the Collector admitted it came up with the first numbers to shock and get the owner’s attention. These numbers proved to be very far off the mark, even under the method finally relied upon by the Collector.
|3The Collector did not comply with the statutory requirements of La.R.S. 47:337.35 (emphasis added):
A.As soon as practicable after each return or report is filed under any of the provisions of this Chapter, the collector shall cause it to be examined and may make such further audit or investigation as he may deem necessary for the purpose of determining the correct amount of tax.
B. The taxpayer and the collector or his designee may enter into a binding agreement to use a sampling procedure as a basis for projecting audit findings, which may result in either an underpayment or overpayment of tax.
C. (1) Before using a sampling procedure to project the findings of an audit and establish a tax liability, the collector or his designee shall notify the taxpayer in writing of the sampling procedure he intends to use, including but not limited to how the tax will be computed, the population to be sampled, and the type of tax for which the tax liability will be established.
(2) The sampling procedure used shall produce a sample which shall reflect as nearly as possible the normal conditions under ivhich the business was operated during the period to which the audit applies. If either the taxpayer or the collector can demonstrate that a transaction in a sample for a particular time period is not representative of the taxpayer’s business operations during that time period, the transaction shall be eliminated from the sample and shall be separately determined in the audit.
(3) If the taxpayer demonstrates that any sampling procedure used by the collector was not developed or applied in accordance with generally recognized sampling techniques, that portion of the audit established by a projection based upon the development or application of the disputed sampling procedure shall be replaced by a projection based upon a new sample that conforms to generally recognized sampling techniques.
(4) Generally recognized sampling techniques and standards set forth by the American Institute of Certified Pub- *696 lie Accountants shall be used as guidance in developing audit sampling techniques for purposes of this Section.
The Collector produced no evidence that Yesterdays and Cowboy’s agreed in writing, prior to commencement of the audit, with his methodology for computing taxes allegedly owed. In fact, Ms. Pettis testified the Collector did not hogive written notice to this taxpayer as to how the tax would be computed as required, but stated she “understand^] now” that such should have been done. Further, Pettis, and Jonathon Thomas (Thomas), the field auditor conducting these audits, provided ample basis for the trial court’s finding that the methodology used by the Collector did not “reflect as nearly as possible the normal conditions under which the business was operated during the period to which the audit applie[d].” See La.R.S. 47:337.35(C)(2). Thomas testified he initially gave no allowance for spillage, breakage, self-consumption and giveaways. He admitted the amount listed in the original Notice of Intent to audit Cowboy’s was grossly overstated. Although he refused to admit the same regarding Yesterdays, the amount in the original Notice of Intent when compared to the final assessment, was also overstated. He also admitted the 2010 “Z-tape” information he used as samplings upon which he based his calculations for the four-year audit period were taken from Yesterdays after it was rebuilt into a much larger facility with much greater capacity than the old club. Thomas also admitted he did not know the patron capacity for the new club but agreed it was much larger than the old one. Despite this acknowledgement, he refused to admit this information was critical to a good estimation of business income during the audit period, and that it should have put him on notice that his audit figures were questionable. If the new club had more than double the capacity of the old club, it is not reasonable to conclude the old club’s nightly patron count would be more than double the new as his audit figures suggest. Thomas admitted he had no knowledge of the operations of the bar and never talked to anyone with either club about their operations. Pettis and Thomas testified it was not required that they have any understanding of how these businesses operated because they just based their determinations of the taxes due |non “what [the clubs] actually purchased” in liquor amounts, their theory being, if one purchased the liquor one sold the liquor, end of calculation. Based on the methodology used by Pettis and Thomas the auditor determined Yesterdays had 610 people a night for every night it was open during the four-year audit period. Yet it is undisputed that the maximum capacity of Yesterdays during the audit period was 350 people. Pettis explained they did not know the capacity of Yesterdays because when they asked the fire department for that information it did not know and “it never got back to them on the subject.” The auditor admitted he did not ask anyone else for that information nor did Pet-tis. As noted, Pettis insisted such information ultimately was not relevant because the amount of liquor the clubs purchased was a proper factor to use in estimating the amount of liquor sold. She admitted when conducting the audit she and Thomas had no knowledge of how these businesses operated. She knew nothing about dollar nights, self-consumption for employees, breakage, spillage, how many nights a week they were open, ivhich nights are busier, and maximum capacity of the clubs. When asked if she could provide the court with the generally accepted sampling techniques, and the American Institute of Certified Public Accountants standards used in these audits, Pettis replied: “I can’t do that, but I talked to his CPA *697 who has access to all of that, and he never once offered a different way of doing it, a proposal.” She then quipped it is the Collector’s “duty to determine the correct amount of tax” owed in an audit.
Pettis also testified she did not think the 610 people a night audit numbers for Yesterdays was off-base even when asked to consider the 2010 sample Z-tapes showed only a nightly average of 300 people, for the new club twice as big in size, with more than double the capacity of the old club. This figure was used in the b ¡.audit to calculate proceeds earned from door cover charges as well as number of drinks sold. Vallet testified the typical numbers for Yesterdays during the audit period was 150 to 200 on Friday nights, 250 to 300 on Saturday nights, and 60 to 70 on Sunday nights. He explained that Sunday nights were not profitable nights and catered to an older crowd between ages 60-80. The capacity of the new Yesterdays was 1,000 people. He explained that he took issue with the auditor’s method because it was so extreme and off-base. The auditors maintained the hard liquor purchased was sold at a 300% profit. But Yallet pointed out that 70% of his business was on dollar-night for dollar-beer. He explained that beer costs about .80 cents a bottle and sells for $1.00 a bottle. He further testified the old Yesterdays never did a $78,000.00 night as stated in the audit. The average was more like $40,000.00, considering the high and low nights. He also disputed the auditors’ assessment of $700,000.00 a year profit for Yesterdays when the building was “50 years old with a capacity of 350 people.” He testified had Yesterdays been making that kind of profit he never would have closed it, maintaining he closed it because it was not profitable. According to Yallet, the building was condemned and he was ordered to tear to it down. That was the reason he built a new establishment.
Based upon the foregoing we cannot say the trial judge manifestly erred in concluding the Collector failed to meet the requirements of La.R.S. 47:337.35. Moreover, given the incredible disparity between the initial and final assessments, and the Collector’s failure to use a methodology for auditing the clubs that would have “reflect[ed] as nearly as possible the normal conditions under which the business was operated during the period to which the audit applie[d],” we reject its argument that the trial court erred in pointing to the discrepancy between the initial |13and final assessment of the clubs as a basis for finding the Collector should have used a different and more acceptable methodology in calculating the taxes, interest and penalties.
Further, the Collector asks that we take judicial notice that the last suspension agreement[1] affecting Yesterdays was *698 executed but was lost, and that we therefore find such an agreement existed as to both clubs since the agreement as to Cowboy’s was introduced in evidence and interrupted prescription. We will not take judicial notice of that which is not shown to exist, and we will not infer that because a taxpayer signed one document he signed another. Proof of waiver of prescription requires more than supposition. We therefore find no manifest error in the trial court’s ruling that the 2005 and 2006 taxes as to Yesterdays have prescribed. Louisiana Revised Statutes 47:337.28.1 (emphasis added), in relevant part provides:
B. If the assessment by the collector is determined by a court of competent jurisdiction to be an arbitrary assessment, the assessment shall neither interrupt nor suspend prescription, and the dealer shall be reimbursed by the collector for reasonable costs of litigation. The amount of costs recoverable under this Section shall 114not exceed ten percent of the taxes, interest, and penalty that were arbitrarily assessed, which amount shall be subject to the discretion of the court as to reasonableness.
C. No assessment shall be made under this Chapter for the purpose of depriving a taxpayer of his constitutional right to a three-year prescriptive period for the assessment of tax in accordance with Article VII, Section 16 of the Constitution of Louisiana.
Moreover, we find that the provisions of La.R.S. 47:337.28.1 prohibit arbitrary assessments such as occurred in this case. The taxpayer provided sufficient records in light of the lack of any notice from the Collector throughout many years that the only records sufficient to show revenue would be “Z-tapes.”
We also find no error in the trial court’s denial of the Collector’s motion for new trial. ‘When reviewing the grant or denial of a motion for new trial, an appellate court cannot reverse the trial court’s decision unless an abuse of discretion can be demonstrated.” Boudreaux v. Cummings, 14-421 (La.App. 3 Cir. 1/14/15), — So.3d -, 2015 WL 160281, *3 (citing Whittington v. QBE Specialty Ins. Co., 12-409 (La.App. 3 Cir. 11/7/12), 105 So.3d 797, writ denied, 12-2646 (La.1/25/13), 105 So.3d 723). Louisiana Code of Civil Procedure Article 1972 sets forth, in pertinent part, the peremptory grounds for a motion for new trial: “(2) When the party has discovered, since trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during trial.” In Boudreaux, — So.3d -, we set forth a movant’s burden of proof to establish grounds for a new trial based on newly discovered evidence:
“(1) [TJhat the evidence was discovered after the trial; (2) that the new evidence is not cumulative; (3) that the new evidence would tend to change the result of the case; and (4) that the new evidence could not have been discovered with due diligence before the trial was completed.” (citation omitted)
Id. at -, *5.
hsThe trial court did not abuse its discretion in concluding the Collector *699 failed to carry its burden to prove the evidence it asserted was newly discovered was not discoverable earlier by due diligence. The Collector was aware during the audit that Vallet made payments to bands, bouncers, and sheriffs deputies but it made no effort to timely procure the evidence it asserted was a basis for a new trial. The evidence was discoverable by due diligence before the final audit assessment was issued and litigated.
For the reasons stated we affirm the trial court’s ruling and assess the costs of this appeal against the Collector.
AFFIRMED.
AMY, J. dissents and assigns reasons.
CONERY, J. dissents and assigns reasons.

. During trial it was discovered in conversations between the attorneys that the Collector was no longer in possession of a document entitled "Agreement to Suspend Prescription of Sales and Use Taxes Administered by the Calcasieu Parish School System” (Suspension Agreement) pertaining to Yesterdays. The Collector asserted that this Suspension Agreement, purportedly signed by the taxpayer, extended the prescriptive period for Yesterdays to December 31, 2010, for the tax years 2005 and 2006. Yesterdays had filed an Amended Petition, unopposed, alleging prescription for the tax years 2005 and 2006. The trial court found the claims against Yesterdays for 2005 and 2006 taxes were prescribed on their face, thus the burden was on the Collector to establish the claims were not prescribed. "Taxes, except real property taxes, and licenses shall prescribe in three years after the thirty-first day of December in the year in which they are due, but prescription may be interrupted or suspended as provided by law.” La. Const. Art. 7, § 16. The Collector is also given three years to bring an action against a taxpayer for unpaid or underpaid taxes through the provisions of Louisiana Revised Statutes 47:337.67, *698 which provides for the interruption or suspension of prescription. Louisiana Revised Statutes 47:337.75(B)(2) (emphasis added) defines a false or fraudulent return as “any report filed with the intent to evade taxes, or a willful attempt to defraud or evade taxes that are due.” This statute includes the element of scienter and we agree with the trial court's finding there is no evidence "to suggest that [Vallet] filed any report with the intent to evade or defraud taxes that were due.” The trial court specifically found Vallet was “both honest and forthcoming” throughout the trial. We find no manifest error in the trial court's ruling.