# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                    NEWS RELEASE #028

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinion handed down on the **13th day of May, 2016**, is as follows:

**BY GUIDRY, J.**:

2015-C -1676          YESTERDAYS OF LAKE CHARLES, INC. v. CALCASIEU PARISH SALES AND USE TAX DEPARTMENT C/W COWBOY'S NIGHTLIFE, INC. v. CALCASIEU PARISH SALES AND USE TAX DEPARTMENT (Parish of Calcasieu)

For the foregoing reasons, we reverse in part the court of appeal's decision affirming the trial court's judgment, affirm that decision in part, and remand to the trial court. More specifically, we reverse the trial court's judgment ordering a refund of the taxes and interest paid under protest by the clubs. We further reverse the trial court's award of attorney fees. In all other respects, the judgment of the trial court is affirmed. The matter is remanded to the trial court to calculate the amount of taxes, interest, and penalties due the Collector and to render judgment consistent with this opinion.
REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.

SUPREME COURT OF LOUISIANA

NO. 2015-C-1676

YESTERDAYS OF LAKE CHARLES, INC. VERSUS CALCASIEU PARISH SALES AND USE TAX DEPARTMENT

CONSOLIDATED WITH

COWBOY'S NIGHTLIFE, INC. VERSUS CALCASIEU PARISH SALES AND USE TAX DEPARTMENT

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT, PARISH OF CALCASIEU

**GUIDRY, J.**

This matter involves the interpretation and application of the Uniform Local Sales Tax Code ("ULSTC"), La. Rev. Stat. 47:337.1 *et seq*. The trial court found ambiguity in the language of the ULSTC requiring the plaintiff nightclubs to "keep and preserve suitable records" of all sales and expenditures. The trial court then found the tax collector had failed to show that the records actually kept by the clubs, in this case, bank statements and deposit slips, were not "suitable records" within the meaning of the ULSTC. The trial court further found the tax collector's assessment was arbitrary and that the tax collector had failed to establish that its methodology for auditing the taxpayer was proper. Accordingly, the trial court ordered the tax collector to refund amounts paid under protest by the clubs. The trial court further determined that prescription had run on the sales taxes for the years 2005 and 2006 for one of the clubs, aside from those taxes admittedly withheld by the clubs. Finally, the trial court denied the tax collector's motion for new trial and awarded attorney fees to the clubs. For the reasons set forth below, we reverse the trial court's judgment ordering a refund of the taxes and interest paid under protest by the clubs. We further reverse the trial court's award of

attorney fees. In all other respects, the judgment of the trial court is affirmed, and the matter is remanded to the trial court for further proceedings.

**FACTS AND PROCEDURAL HISTORY**

Yesterdays of Lake Charles, Inc. (Yesterdays) and Cowboy's Nightlife, Inc. ("Cowboy's") are cash-based bars or nightclubs located adjacent to each other in Calcasieu Parish. The clubs are owned by Clarence Vallet, who opened Cowboy's in 1991, with a capacity of up to 1,000 patrons, and Yesterdays in 2001, with a capacity of 350.[1] They both offered various promotions, giveaways, and incentives to attract customers, while Yesterdays hired bands. The clubs conceded their taxable transactions included selling alcohol and collecting cover charges. As retail vendors who make taxable sales, the clubs were thus "dealers" required by law to charge, collect, and remit sales taxes as the tax collector's agents. *See* La. Rev. Stat. 47:337.18(A)(5). The clubs must report "gross sales" and sales taxes each month. *See* La. Rev. Stat. 47:337.18(A)(1)(a). The clubs were audited commencing on November 3, 2009, by the Calcasieu Parish School System Sales and Use Tax Department ("Collector," *see* La. Rev. Stat. 47:301) for years 2005 through 2008, on the basis that the clubs had violated their duties as tax collection agents for the Calcasieu Parish School System.

The clubs, as the trial court found and about which there is little dispute, used the following system for the reporting and remitting of sales taxes: To account for cash sales, the managers would meet at the end of the night with the bartenders, each of whom was assigned a cash register. The bartenders would each bring the drawer from their register, along with the register's "z-tape." According to the testimony of the Collector's auditor, a "z-tape" or register tape is a printed

---

[1] A new Yesterdays was later built and opened sometime in 2010 with a capacity of 1000.

tape produced by the cash register that reflects the amount of all sales transactions recorded on the particular machine. *See also Travia's, Inc. v. Dept. of Taxes*, 86 A.3d 394, 396 (Vt. S. Ct. 2013). The manager would count the cash and match the total against the z-tapes to balance the registers at the end of the night. The cash was then placed into a safe located on the premises of the nightclubs. On the following Monday, the cash was deposited by the managers into each club's respective bank account. Mr. Vallet testified that it was solely the managers' responsibility to deposit the cash. The clubs' bookkeeper, a Certified Public Accountant ("CPA"), was then given the deposit receipts and monthly bank statements. The CPA would then report the bank deposits as the taxable sales, multiply that amount by the applicable tax rate, and remit that sum as sales taxes. Mr. Vallet testified that he has used this system for twenty-two years on the advice of his CPA for reporting and remitting sales taxes, and that at no point prior to the audit period in question was this system deemed unacceptable by the Collector.

Although the clubs conceded the z-tapes would be the best evidence of sales, the tapes were neither printed nor retained after their use for internal purposes. Mr. Vallet admitted the clubs kept no record of the number of people who entered the bars or the cover charges collected and deposited. The testimony further revealed the clubs used undocumented amounts of cash revenue to pay undocumented expenses before making the bank deposits. These expenses included cash payments to bands at Yesterdays, totaling some $205,000, according to Mr. Vallet, as well as cash disbursements to off-duty sheriff's deputies and bouncers for both clubs, totaling some $14,400.[2] The clubs kept no records of these cash expenditures and

---

[2] In its Motion for New Trial based on newly discovered evidence, the Collector asserted the clubs paid the off-duty sheriff's deputies an amount closer to $312,000 during the audit period. However, as discussed below, we find no error in the trial court's denial of the Collector's motion.

disbursements. Both Mr. Vallet and his CPA later admitted the bank deposit slips were therefore imprecise records of actual gross sales because an unrecorded portion of the moneys collected was not deposited in the bank. The bank deposit records did not accurately reflect actual sales, necessarily resulting in an underpayment of taxes.

The parties stipulated Yesterdays reported total sales of $2,249,098.00 for the tax period at issue and paid total sales taxes to the Collector of $107,637.94. Cowboy's reported total sales of $3,945,053.00 and paid the Collector taxes totaling $188,951.00 for the period at issue. The parties also stipulated, for the same period, Yesterdays paid state sales taxes totaling $89,964.00 and Cowboy's paid the state $157,801.00.

As a result of the audit, the Collector issued a Notice of Collector's Intent to Assess additional taxes due to the Calcasieu Parish School System, dated January 19, 2010. An accompanying cover letter explained that an examination of the clubs' sales tax returns indicated a discrepancy in the reporting of sales transactions for the audit period. The letter stated the sales tax returns were unable to be reconciled due to the lack of support for the amounts on the sales tax returns "such as z-tapes, shift change reports, etc." Consequently, the auditors reviewed all purchases of beer and liquor from the clubs' vendors for three months in each year of the four-year period, and a mark-up was applied to determine the taxable sales the Collector stated should have been reported. The sales figures were also used to determine the cover charges that should have been reported as sales. For liquor, the number of bottles was converted to ounces, and the number of drinks was calculated at 1.5 ounces per drink, which price was estimated at $4.75 per drink. Cover charges were determined at a ratio of three drinks for every cover

4

charge, which was estimated to be $5. For beer, the number of bottles of beer purchased was adjusted for dollar nights at the club by dividing the number by four (four weeks in a month) and multiplying that number by $1; the remaining bottles were estimated to have been sold at $2.75 per bottle on average. Like liquor, one cover charge of $5 was assigned for every three bottles of beer sold.

The Notice of Intent to Assess dated January 19, 2010, estimated Yesterdays' taxes due to the Calcasieu Parish School System in the amount of $217,190.49, and with interest and penalties, totaled $376,088.65. The Notice informed the clubs they could timely file a written protest and request a hearing. Protests by the clubs resulted in two hearings before the School Board, following which the clubs gradually provided additional information such as closure of the clubs due to Hurricanes Rita and Ike, promotional nights, spillage, frozen beer, door charges, non-alcoholic drinks, happy hours, and complimentary beverages. As more information was provided to the Collector by the clubs, Yesterday's estimated taxes due were reduced to $115,712.16 in the first Amended Assessment, dated July 10, 2010, then lowered to $92,362.81 on July 29, 2010, in the second Amended Assessment, and ultimately assessed at $85,353.60 on August 26, 2010. With interest and penalties the final assessment resulted in a tax bill for Yesterdays totaling $155,662.95. In the Collector's initial Notice of Intent to Assess for Cowboy's, issued on January 19, 2010, the amount due was assessed at $219,161.87 and with interest and penalties totaled $366,989.50. The first Amended Assessment dated July 10, 2010 lowered the assessed amount to $56,183.17; the second Amended Assessment again lowered the amount to $35,415.15; and the Final Assessment for Cowboy's was $29,292.42. With interest and penalties added to the tax assessed, the final total for Cowboy's was $49,973.99.

5

The clubs ultimately paid the amounts under protest and filed suit challenging the final assessments and the methodology used in reaching them. The trial court ruled in favor of Yesterdays and Cowboy's, ordering a refund of the amounts paid, but deferred a ruling on the issue of attorney fees due the clubs. The Collector filed a motion for new trial, which the trial court denied. At the hearing on the motion for new trial, the court awarded attorney fees to the clubs pursuant to La. Rev. Stat. 47:337.13.1(B)(1).

Thereafter, the Collector appealed the trial court's judgment. In a split decision, the court of appeal affirmed the trial court's judgment in favor of the clubs. *Yesterdays of Lake Charles, Inc. v. Calcasieu Parish Sales and Use Tax Department*, 14-413, 2014-414 (La. App. 3 Cir. 5/13/15), 169 So.3d 689. We granted certiorari to review the judgment of the court of appeal. *Yesterdays of Lake Charles, Inc. v. Calcasieu Parish Sales and Use Tax Department*, 15-1676 (La. 11/16/15), 184 So.3d 20. For the reasons that follow, we reverse the judgments of the lower courts in part, and remand to the trial court for further proceedings consistent with this opinion.

**DISCUSSION**

The Collector first asserts the trial court legally erred in finding ambiguity in the requirement of La. Rev. Stat. 47:337.29(A)(1) that the dealer must "preserve suitable records of the sales, purchases, or leases taxable pursuant to this Chapter." The Collector further asserts the trial court erred in effectively finding the clubs' bank statements and deposit slips were "suitable records" within the meaning of the statute, when the clubs had actually destroyed their records of actual gross sales while keeping only records of net sales. Accordingly, we must determine whether the lower courts properly interpreted and applied the statute.

When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. Civ. Code art. 9; La. Rev. Stat. 1:4. This principle applies to tax statutes. *Tarver v. E.I. Du Pont de Nemours and Co.*, 93-1005 (La. 3/24/94), 634 So.2d 356, 358 (collecting sources). When there is reasonable doubt as to the meaning of a tax law, the courts should strictly construe the law against the state and in favor of the taxpayer. *Id.*

With respect to the "suitable records" issue in the present case, we find for the reasons below that La. Rev. Stat. 47:337.29(A)(1) and its implementing regulation, La. Admin. Code, Title 61, Part 1 § 4359, are clear and unambiguous and do not lead to absurd consequences. The statutes clearly provide that for the purpose of reporting and paying sales taxes, the dealer must "keep and preserve suitable records of the sales...and such other books of accounts as may be necessary to determine the amount of tax due hereunder...." La. Rev. Stat. 47:337.29(A)(1).

Louisiana Revised Statutes 47:337.29 and its implementing regulation, La. Admin. Code Tit. 61, pt. 1 § 4359, provide the basis for the record keeping requirements for establishments such as Yesterdays and Cowboy's. La. Rev. Stat. 47:337.29 provides in pertinent part (emphasis added):

> A. (1) **Every dealer** required to make a report and pay any tax under this Chapter **shall keep and preserve suitable records of the sales**, purchases, or leases taxable pursuant to this Chapter, **and such other books of accounts as may be necessary to determine the amount of tax due hereunder**, and other information as may be required by the collector; and **each dealer shall secure, maintain and keep until the taxes to which they relate have prescribed, a complete record of tangible personal property received**, used, **sold at retail**, distributed, or stored, leased or rented, within the taxing jurisdiction by the said dealer, **together with invoices, bills of lading, and other pertinent records and papers as may be required by the collector for the reasonable administration of the tax, and a complete**

**record of all sales or purchases of services taxable** as provided in this Chapter until the taxes to which they relate have prescribed. (Emphasis supplied.)

Louisiana Administrative Code, Title 61, Part 1 § 4359 provides in pertinent part (emphasis added):

> A. As provided in R.S. 47:309 and **R.S. 47:337.29**, every person required to collect or remit the tax imposed under R.S. 47:302, 321, 331, and local ordinances **shall keep a permanent record of all transactions in sufficient detail to be of value in determining the correct tax liability. The records to be kept shall include all sales invoices, purchase orders, merchandise records, inventory records,** credit memoranda, debit memoranda, bills of lading, shipping records, **and all other records pertaining to any and all purchases, sales, or use of tangible personal property whether or not the person believes them to be subject to state or local sales or use tax.** Full detail must be kept of all property leased or rented from or to others and all services performed for or by others. **They must also keep all summaries' recapitulations, totals, journal entries, ledger accounts, accounts receivable records, accounts payable records, statements, tax returns, and other documents listing, summarizing, or pertaining to such sales, purchases**, inventories, shipments, or other transactions dealing with tangible personal property.

In finding the term "suitable records" ambiguous, the trial court and the majority in the court of appeal first noted the term "suitable records" is not defined in the statute. The court of appeal further noted Mr. Vallet's long history of using bank deposits, on the advice of his CPA, for reporting and remitting sales taxes, and that the Collector had never before deemed his methods to be unacceptable. The court below faulted the Collector for not providing specific guidance to taxpayers as to what records should be maintained, such as lists of suitable records. The trial court believed the Collector was remiss in failing to adopt "a formal set of rules or regulations detailing to the public exactly what constitutes the requisite suitable records." The court of appeal, noting that the clubs' method of estimating

8

revenue had been accepted by other entities over the years, reasoned the clubs had no notice their tax reporting system was improper or incorrect.[3] The lower courts, though no other court in Louisiana has previously done so, concluded there was uncertainty in the types of records to be preserved, and thus held the statute must be interpreted liberally in favor of the dealer or taxpayer and against the taxing authority. The lower courts then effectively concluded the bank deposit records kept by the clubs, which the testimony revealed reflected only net sales and not gross sales, were "suitable records" within the meaning of La. Rev. Stat. 47:337.29.

We find legal error in such reasoning. Both the statute and its implementing regulation, La. Admin. Code Tit. 61, pt. 1 § 4359, clearly use the mandatory "shall" in requiring specific documentation to be kept by the clubs, including for "all sales," while the regulation mandates records be kept of "all services performed for or by others," which would include payments to the sheriff's deputies and bouncers hired for security, the bands performing at the clubs, as well as all the "free giveaways" to various groups and organizations.[4] While the clubs had never before been audited by the Collector, we agree with the dissenters below that there is no requirement under the statutes mandating the Collector tell the

---

[3] The court of appeal relied on *United States v. Dorsey*, 499 Fed. Appx. 176, 178 (3rd Cir. 2012), for the premise that bank deposits can be used to establish proof of taxes owed by a taxpayer. *Yesterdays*, p. 7, 169 So.3d at 694. We do not disagree that bank deposits can be relevant to proving income in an appropriate case. However, we find they are not "suitable records" in and of themselves for recording all actual sales as required by law, especially here, where the clubs' owner effectively conceded the bank deposits did not accurately reflect "all sales."

[4] *See* La. Rev. Stat. 1:3, which provides:

> Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.

> The word "shall" is mandatory and the word "may" is permissive.

dealer or taxpayer exactly what records he or she should "keep and preserve." *See* La. Rev. Stat. 47:337.29(A)(1). Nor does not providing such explicit guidance transfer the burden of proving what constitutes "suitable records" to the Collector. Instead, the statute clearly and logically places such responsibility directly on the dealer or taxpayer. The clubs' reliance on their CPA, who admitted he was not familiar with the pertinent statute, does not excuse them from the mandates of the statute. *See* La. Civ. Code art. 5 ("No one may avail himself of ignorance of the law.").

We find support for our holding today, that there is no ambiguity in La. Rev. Stat. 47:337.29, in previous cases examining La. Rev. Stat. 47:309, which has an identical "suitable records" requirement.[5] In *Calcasieu Par. Sch. Bd. v. Parker*, 02-339 (La. App. 3 Cir. 10/2/02), 827 So.2d 543, 546, *writ denied*, 02-2719 (La. 1/10/03), 834 So.2d 440, the taxpayer did not keep adequate records, precluding an accurate audit of his taxable sales, because he could not produce 440 invoices out

---

[5] Entitled "Dealers required to keep records," La. Rev. Stat. 47:309 provides:

A. (1) Every dealer required to make a report and pay any tax under this Chapter shall keep and preserve suitable records of the sales, purchases, or leases taxable under this Chapter, and such other books of accounts as may be necessary to determine the amount of tax due hereunder, and other information as may be required by the secretary; and each dealer shall secure, maintain and keep until the taxes to which they relate have prescribed, a complete record of tangible personal property received, used, sold at retail, distributed, or stored, leased or rented, within this state by the said dealer, together with invoices, bills of lading, and other pertinent records and papers as may be required by the secretary for the reasonable administration of this Chapter, and a complete record of all sales or purchases of services taxable under this Chapter until the taxes to which they relate have prescribed.

(2) These records shall be open for inspection to the secretary at all reasonable hours.

(3) The secretary is authorized to require all dealers who take deductions on their sales tax returns for total sales under the minimum taxable bracket prescribed by him pursuant to R.S. 47:304 to support their deductions by keeping written or printed detailed records of said sales in addition to their usual books and accounts.

B. Any dealer subject to the provisions of this Chapter who violates the provisions of this Section may be fined not more than five thousand dollars or imprisoned for not more than sixty days, or both, for any such offense.

of a total sequenced number of 616.   The *Parker* court, in upholding the assessment made by the School Board, reasoned as follows:

> Pursuant to Louisiana Revised Statute 47:309, it is the duty of the retailer to keep and preserve suitable records until the taxes to which they relate have prescribed. Parker cannot now complain that an arbitrary assessment was inequitable when it was his duty to maintain records. With no records to determine what his actual sales were, the School Board had the right to utilize some method of determining what taxable sales Parker had for the audit period. *Schwegmann Bros. Giant Super Mkts., Inc. v. Mouton*, 309 So.2d 686 (La. App. 4 Cir. 1974), *writs denied*, 310 So.2d 845 (La. 1975). We do not find that the method used by the School Board was unconscionable or inequitable.
>
> *Parker*, p. 6, 827 So.2d 546-47.

Having found the lower courts made a legal error in interpreting La. Rev. Stat. 47:337.29(A)(1) and assigning the burden of proof to the Collector rather than the taxpayers, we engage in a *de novo* review of the facts bearing on the issue of whether the clubs kept "suitable records" within the meaning of La. Rev. Stat. 47:337.29(A)(1).   Based on our review of the record, we find the lower courts erred in effectively concluding the bank statements and deposits alone, reflecting at best net sales, were sufficient to meet the record keeping requirements of La. Rev. Stat. 47:337.29(A)(1). Mr. Vallet's own testimony belies the contention the bank statements alone could provide reliable proof of actual taxable sales. The z-tapes from the cash registers at the doors of both clubs reflected the amount of cover charges actually collected; thus, the clubs, to comply with the statute, were required to keep such records.   The clubs were also required under the statute and regulation to keep records for services provided by the bands, the sheriff's deputies, and bouncers. Tellingly, Mr. Vallet used the actual cash register z-tapes to calculate bar sales for his own purposes. He explained that he used the z-tapes to prevent employee theft by making sure the bartenders and managers had cash in the register to match the sales totals on the z-tapes. He testified that he allowed the

11

bartenders a $10 nightly leeway on drink sales when the cash was balanced against the z-tapes. Nevertheless, Mr. Vallet testified the z-tapes were not kept with the nightly cash takes or sent to the clubs' CPA for comparison with the bank deposits, but were instead disposed of in some manner. Although the trial court found the failure of Mr. Vallet to maintain these z-tape records was "nothing more than an honest mistake, and that this was not done for the purpose and intent to evade taxes," the clubs were not released from their duty of keeping and preserving the records of "all sales" required under the clear language in La. Rev. Stat. 47:337.29 and La. Admin. Code Tit. 61, pt. 1 § 4359. As the clubs effectively conceded, because various cash amounts were deducted from the gross sales each night, the net cash bank deposits alone could not accurately reflect actual sales. The bank deposit records alone were thus not "suitable records" of "all sales" within the meaning of La. Rev. Stat. 47:337.29.

Accordingly, we find the trial court committed reversible error in determining that La. Rev. Stat. 47:337.29 was ambiguous, thereby improperly shifting the burden to the Collector to prove that bank statements alone did not constitute "suitable records." We hold the legislature intended, from the clear wording of the statute, to place the burden on the dealer or taxpayer, rather than the Collector, to prove he or she has kept "suitable records" of all taxable transactions. Based on the trial record, there can be no other conclusion than the clubs failed to establish they had kept and preserved "suitable records" of "all sales" as required by La. Rev. Stat. 47:337.29.

The Collector next asserts the trial court erred in finding "the Collector's arbitrary tax calculation methodology was improper." Upon reviewing the interplay among La. Rev. Stats. 47:337.35, 47:337.28, and 47:337.28.1, we find

12

merit in the Collector's contention for several reasons. As explained below, we find La. Rev. Stats. 47:337.28 and 47:337.28.1 are applicable under the facts of this case.

Under La. Rev. Stat. 47:337.35(A), entitled "**Collector's duty to determine correct tax**," the Collector "shall" examine every report filed under the ULSTC "and **may** make such further audit or investigation as he may deem necessary for the purpose of determining the correct amount of tax." (Emphasis supplied.) Thus, the Collector has the sole discretion under this statute to audit or investigate a report to ascertain the correct tax. Furthermore, under La. Rev. Stat. 47:337.48(B), entitled "**Determination and notice of tax due**," the Collector "shall cause an audit, investigation, or examination, as provided for in R.S. 47:337.35, to be made to determine the tax, penalty, and interest due," if the "return or report made and filed does not compute the liability of the taxpayer." La. Rev. Stat. 47:337.48(B) further provides: "Having determined the amount of tax, penalty, and interest due, the collector shall send by mail a notice to the taxpayer … setting out his determination and informing the person of his purpose to assess the amount so determined against him after thirty calendar days from the date of the notice." The Collector obviously exercised its authority in this case under either of these provisions when it commenced an audit of the clubs' reports.

So as to determine the correct tax, the taxpayer and the Collector "**may** enter into a binding agreement to use a sampling procedure as a basis for projecting audit findings…." La. Rev. Stat. 47:337.35(B). Thus, the parties have the discretion to agree to a particular sampling method for projecting taxes due, which could result in either an underpayment or overpayment of tax. Contrary to the

holdings of the lower courts, there is no requirement in this statute that such an agreement must be in writing to be binding on the parties.

However, under La. Rev. Stat. 47:337.28, which is notably titled "**Collector's authority to determine the tax in certain cases**," the Collector is mandated to estimate the retail sales of a dealer who "fails to make a report and pay the tax as provided in [the ULSTC]" or makes a "grossly incorrect report or a report that is false or fraudulent." The statute provides in pertinent part:

A. **In the event any dealer fails to make a report and pay the tax as provided in this Chapter or in case the dealer makes a grossly incorrect report or a report that is false or fraudulent, the collector shall make an estimate of the retail sales of such dealer for the taxable period…and of the gross amounts paid or charged for services taxable**; and it shall be the duty of the collector to assess and collect the tax together with any interest and penalty that may have accrued thereon, **which assessment shall be considered prima facie correct and the burden to show the contrary shall rest upon the dealer**. (Emphasis added.)

Thus, under this statute, if the Collector determines the taxpayer failed "to make a report and pay the tax as provided in [the ULSTC]" or filed a "grossly incorrect report," the Collector "shall" make an estimate of the retail sales of such dealer for the taxable period. We agree with the dissents below that there is no additional requirement for the Collector to prove the clubs' reports were "false or fraudulent," or filed with the intent to defraud or evade taxes that are due. The word "or" has a clear meaning in the statute. Accordingly, the lower courts committed legal error in placing the burden upon the Collector to also prove the clubs' reports were false or fraudulent before it could invoke the mandatory assessment required by this statute. Reviewing the record *de novo* then, we find the clubs failed to "make a report and pay the taxes as required by [the ULSTC]" or filed reports that were

"grossly incorrect" under La. Rev. Stat. 47:337.29.[6] The record establishes the clubs at minimum failed to remit the required sales taxes on all taxable transactions. Thus, La. Rev. Stat. 47:337.28(A) applies in this case, and the Collector was bound by that statute to "make an estimate of the retail sales of such dealer for the taxable period … and of the gross amounts paid or charged for services taxable."

In this case, it was reasonable for the Collector to commence an audit or further investigation under its statutory duty and discretionary authority in La. Rev. Stat. 47:337.35(A), or under its mandate pursuant to La. Rev. Stat. 47:337.48, but once it determined the clubs had failed "to make a report and pay the tax as provided in this Chapter or … [made] a grossly incorrect report," the Collector then became obligated by La. Rev. Stat. 47:337.28(A) to make "an estimate of the retail sales of such dealer for the taxable period ... and of the gross amounts paid or charged for services taxable." Accordingly, we find no merit to the clubs' argument the Collector is now precluded from relying on La. Rev. Stat. 47:337.28 and La. Rev. Stat. 47:337.28.1 simply because the Collector did not invoke those statutes when it initially commenced the audit or investigation authorized under La. Rev. Stat. 47:337.35(A).

We further find the lower courts erred in determining the Collector's assessment was "arbitrary" and that the Collector, rather than the dealers/clubs, had the burden of proving the Collector's assessment was in compliance with the law. As explained above, La. Rev. Stat. 47:337.28(A) provides that, when the dealer fails to comply with the ULSTC or files a "grossly incorrect" report, the Collector

---

[6] Although applicable by its language to the section on the Collector's entitlement to reimbursement of examination and hearing costs, the term "grossly incorrect report" is defined in La. Rev. Stat. 47:337.75 as "any report filed where there is substantial understatement of tax for any taxable period. The understatement is substantial if it exceeds the greater of: (a) Ten percent of the tax required to be shown on the return for the taxable period, or (b) Ten thousand dollars."

has a statutory duty to make an assessment and collect the taxes due. The statute further provides that such assessment made by the Collector "shall be considered prima facie correct." La. Rev. Stat. 47:337.28(A). The statute thereafter explicitly provides that the burden to show that the Collector's assessment of taxes owed was not made in compliance with the law is squarely placed on the dealer by virtue of the clear language of the statute. La. Rev. Stat. 47:337.28(A). The lower courts legally erred in finding otherwise.

Furthermore, although La. Rev. Stat. 47:337.28.1, entitled "Arbitrary assessments prohibited," forbids the Collector from "issuing an arbitrary assessment," the Collector's assessment cannot be considered an "arbitrary assessment" if the taxpayer fails to comply with the records requirements of La. Rev. Stat. 47:337.29. Because, as we have determined previously, the clubs failed to provide "suitable records" as set forth in the La. Rev. Stat. 47:337.29, the trial court erred in determining that the Collector's assessment was "arbitrary" and then placing the burden on the Collector to show the assessment was made in compliance with the law. La. Rev. Stat. 47:337.28.1(A) provides as follows:

> Notwithstanding any provision of this Chapter to the contrary, **the collector shall be prohibited from issuing an arbitrary assessment**. For purposes of this Chapter, the term "arbitrary assessment" shall mean an estimated assessment issued by the local collector which does not comply with R.S. 47:337.28, 47:337.48(A), or 47:337.53. However, no provision of this Chapter shall prevent the collector from determining correct tax as provided for in R.S. 47:337.35. **An assessment shall not be considered an "arbitrary assessment" if the taxpayer does not provide records as required by R.S. 47:337.29** and/or R.S. 47:337.36**. The taxpayer shall bear the burden of proving that the assessment was not in compliance with the law.** (Emphasis added.)

16

Pursuant to this statute, an estimated assessment by the Collector pursuant to La. Rev. Stat. 47:337.28 cannot be considered "arbitrary" if, as here, the clubs failed to provide "suitable records" pursuant to La. Rev. Stat. 47:337.29, in this case the z-tapes, or any other record of actual gross sales, as well as accurate records of cash payments to security personnel, bouncers, and bands. Accordingly, as clearly provided in La. Rev. Stat. 47:337.28.1(A), the clubs then had the burden of proving the assessment made by the Collector "was not in compliance with the law." Mr. Vallet admitted to not preserving the very records he used for the clubs' internal purposes in calculating sales and balancing the amount sold against the cash collected to prevent employee theft. Thus, because the assessment made by the Collector cannot be considered "arbitrary" under these conditions, the clubs necessarily bear the burden of proving the Collector's assessment was "not in compliance with the law." We thus agree with the dissenters below that the trial court erred when it found that, even if the clubs did fail to maintain suitable records as required by La. Rev. Stat. 47:337.29, the Collector's assessment was nevertheless "arbitrary" and that the Collector failed to show that its tax calculation methodology was proper.

Having established that the clubs failed to provide the records required by La. Rev. Stat. 47:337.29, that the Collector was therefore mandated to make an assessment of the tax due, La. Rev. Stat. 47:337.28, that such a mandatory assessment made by the Collector cannot be deemed "arbitrary," and that the clubs therefore had the burden of proving the assessments made were not in compliance with the law, La. Rev. Stat. 47:337.28.1, we must determine whether the trial court erred in applying La. Rev. Stat. 47:337.35 to find that the Collector's assessment did not comply with the law and that it should have used an alternative

17

methodology. We agree with the dissenters below that the lower courts made numerous legal errors in interpreting and applying La. Rev. Stat. 47:337.35.

First, mindful that under La. Rev. Stat. 47:337.28.1 the Collector's assessment may not be deemed "arbitrary" under the facts of this case and that the clubs therefore had the burden of proving the Collector's assessment was not made in compliance with the law, we find the trial court improperly interpreted and applied La. Rev. Stat. 47:337.35 to shift the burden of proof once again back to the Collector to show that it had not engaged in an "arbitrary" estimated assessment and that its methodology did not comport with the law.

La. Rev. Stat. 47:337.35(C) provides:

(1) **Before using a sampling procedure to project the findings of an audit and establish a tax liability, the collector or his designee shall notify the taxpayer in writing of the sampling procedure he intends to use**, including but not limited to how the tax will be computed, the population to be sampled, and the type of tax for which the tax liability will be established.

(2) The sampling procedure used shall produce a sample which shall reflect as nearly as possible the normal conditions under which the business was operated during the period to which the audit applies. If either the taxpayer or the collector can demonstrate that a transaction in a sample for a particular time period is not representative of the taxpayer's business operations during that time period, the transaction shall be eliminated from the sample and shall be separately determined in the audit.

(3) If the taxpayer demonstrates that any sampling procedure used by the collector was not developed or applied in accordance with generally recognized sampling techniques, that portion of the audit established by a projection based upon the development or application of the disputed sampling procedure shall be replaced by a projection based upon a new sample that conforms to generally recognized sampling techniques.

(4) Generally recognized sampling techniques and standards set forth by the American Institute of Certified Public Accountants shall be used as guidance in developing audit sampling techniques for purposes of this Section.

First, we find the lower courts erred in holding the dealer or taxpayer must agree **in writing** to the sampling procedure to be used by the Collector. There is no requirement in La. Rev. Stat. 47:337.35(B), as explained previously, that an agreement between the taxpayer and the Collector regarding the sampling procedure to be used to determine the correct tax must be in writing in order to be binding on the parties. Nor is there any suggestion in the statute that, if agreement on the "sampling procedure" to be used is not in writing, then the Collector's assessment may then be deemed "arbitrary," or not in compliance with La. Rev. Stat. 47:337.35. The lower courts simply erred in so holding. Instead, the only writing requirement in La. Rev. Stat. 47:337.35 is that the Collector must notify the taxpayer **in writing** of the sampling procedure it intends to use to project the findings of an audit and establish a tax liability. La. Rev. Stat. 47:337.35(C)(1).

But even in applying La. Rev. Stat. 47:337.35(C)(1), the trial court manifestly erred in finding the Collector failed to notify the clubs "in writing" of the "sampling procedure" the Collector intended to use "[b]efore using a sampling procedure to project the findings of an audit and establish tax liability." According to the record, the Collector's auditor, Jonathan Thomas, contacted the clubs' CPA as directed and explained to him that the Collector was scheduled to perform a sales and use tax audit of the clubs. When the CPA expressed reservations about the quantity of documents that would be required for the audit, Mr. Thomas proposed "block sampling" using three months of each of the years during the tax period in question. The CPA verbally agreed, so Mr. Thomas explained that he would send a letter informing the clubs of the months that would be selected and the documents required.[7] Thereafter, on November 3, 2009, the Collector mailed

---

[7] According to the testimony of Mr. Thomas, he emailed the clubs' CPA with proposed months to be used, but he received no response or objection.

an audit packet to the clubs' CPA containing an audit letter informing the clubs of the period under audit and the information needed to perform the audit. The audit letter specified the actual months to be sampled and the documents to be produced, including copies of actual sales invoices and copies of actual purchase invoices for consumables and mixed assets. The letter explained that the Collector would "do a block sample audit for sales for the [selected months]" and "do a complete examination of your purchase invoices for all years." Mr. Thomas's supervisor, Kathy Pettis, the School Board's audit manager at the time, explained that using the "block sample" produces a ratio, which is then applied to the other months of the taxable year. If a dealer declines to agree to block sampling, then the auditor would perform a review of all purchases for all 48 months of the subject period.

The clubs provided copies of actual purchase invoices and bank statements, as well as tax returns. However, Mr. Thomas testified that in an audit of a retail establishment, he did not consider bank statements as proper sales documentation. Accordingly, Mr. Thomas informed the clubs' CPA that he would need additional documentation to justify the bank statements. When those were not forthcoming, Mr. Thomas offered to use the purchase invoices and allocate a dollar amount thereto, to which the CPA agreed. Mr. Thomas also requested other documentation from the clubs' CPA regarding drink prices and the like; however, the clubs provided no further information. Thereafter, on January 19, 2010, the Collector mailed a Notice of Intent to Assess, issued pursuant to La. Rev. Stat. 47:337.48(B), accompanied by a letter explaining the procedure and mark-up methodology used to conduct the audit review of the purchase invoices provided by the clubs, the results of which would then be used to make the assessment and establish the tax liability of the clubs. The Notice of Intent to Assess included an initial projected estimate based on the procedures outlined in the letter. Thereafter, as discussed

previously, the Collector's assumptions were adjusted and the mark-ups modified as the clubs gradually provided more information regarding closures, spillage, complimentary beverages, and the like.[8]

We find the initial audit letter and the letter accompanying the Notice of Intent to Assess were sufficient to inform the clubs of the "sampling procedure" the Collector intended to use to project the findings of the audit so as to determine the correct tax. The clubs were notified of and agreed to "block sample" three months for each of the four years at issue, but when records of all actual sales were not provided, records we have previously found the clubs were required by law to keep and preserve, the Collector proposed a review of the purchase invoices made with a resale certificate. The clubs provided no further information regarding actual sales, according to Mr. Thomas. The Collector also informed the clubs in the letter accompanying the Notice of Intent to Assess of the methodology that would be used with regard to the purchase invoices. The clubs never objected to the use of the purchase invoices or the mark-up methodology to project the findings of the audit and determine the tax, nor did they provide records of actual sales as required by law; instead, the clubs objected only to the Collector's assumptions or requested certain allowances. The Collector accommodated those objections and requests to a large extent, as evidenced by the multiple reductions in the assessed taxes due. That the initial assumptions made by the Collector were adjusted as more information was provided by the clubs did not render unreasonable the method used by the Collector, because these adjustments did not substantially change the general "sampling procedure," that is, "block sampling" by selecting three months

---

[8] According to the record, during the assessment process the clubs made various objections to some of the assumptions and mark-ups used by the Collector to estimate the tax. However, a complete drink price list was not provided to the Collector until after the interrogatories were issued in the subsequent legal proceeding.

from each year of the subject period and analyzing the purchase invoices for those months, as was outlined by the Collector in the letters to the clubs' CPA.[9] In addition, the clubs did not object to the "block sampling" method or the "mark-up" analysis of the purchase invoices during either the audit or the assessment proceedings. Thus, we conclude from the record before us that the Collector adequately complied with the notice requirements of La. Rev. Stat. 47:337.35(C)(1).

Having determined the clubs failed to keep "suitable records" as required by La. Rev. Stat. 47:337.29, and because the Collector complied with the notice requirements of La. Rev. Stat. 47:337.35(C), we next turn to the issue of whether the clubs carried their burden of proving the Collector's method of projecting the audit findings and determining the correct amount of tax due "was not developed or applied in accordance with generally recognized sampling techniques…." *See* La. Rev. Stat. 47:337.35(C)(3); *see also* La. Rev. Stat. 47:337.28. If the taxpayer meets that burden, "that portion of the audit established by a projection based upon the development or application of the disputed sampling procedure shall be replaced by a projection based upon a new sample that conforms to generally recognized sampling techniques." *Id.* It is well settled, and the provisions embody this general rule, that "if a tax payer fails to keep proper records, or for some other reason exact information is unavailable, some formula must be devised to determine the tax established by the legislative authority." *Schwegmann Bros. Giant Super Markets, Inc. v. Mouton*, 309 So.2d 686, 692 (La. App. 4th Cir. 1974) (quoting *Russo v. Donahue*, 226 N.E.2d 747 (Ohio 1967)), *writ denied*, 310 So.2d

---

[9] When the clubs' CPA requested a suspension of the audit, the Collector agreed, so long as the clubs kept the z-tapes for the two-month suspension period in April and May of 2010, as well as documentation showing items such as spillage, breakage, and comps. The clubs agreed to provide that information, which the Collector used to compare to the audit and assessment determinations.

845 (La. 1975). For the following reasons, we find the lower courts erred in finding the clubs overcame the presumption of correctness and carried their burden of proof.

First, we find the trial court erred in reasoning that the large discrepancy between the initial and the final assessment alone provided a basis for its conclusion the Collector was required to employ an alternative methodology in calculating the taxes, interest and penalties due by the clubs. As we have noted previously, the audit and initial estimated assessment necessarily resulted from the employment of generic assumptions because the clubs had provided no specific information as to their operating procedures or pricing, much less their actual sales. As the clubs provided some of this information to the Collector during the assessment proceedings, the Collector revised its assumptions to arrive at a more accurate estimated tax due. Accordingly, the discrepancy between the initial and final tax determinations was not due to the "improper" methodology of the Collector, which used a mark-up analysis on purchased inventory, but was instead due to the lack of information provided by the clubs, which, as we have held, failed to maintain suitable records as required by law. We thus agree with the dissenters below that there is no evidentiary support for the trial court's determination that the Collector should have used an alternative methodology simply because of the difference between the initial and final assessments.

Additionally, we find the clubs failed to present any evidence the audit and assessment methods used by the Collector failed to comply with the requirements of either La. Rev. Stat. 47:337.28(A) or 47:337.35(A). Neither of these statutes incorporates any specific estimating standards, nor could they, given the wide variety of businesses and taxable transactions. However, when a "sampling

23

procedure" is utilized by the Collector to project audit findings to determine the correct amount of tax, pursuant to La. Rev. Stat. 47:337.35(B) and (C), the Collector is required to seek guidance from "[g]enerally recognized sampling techniques and standards set forth by the American Institute of Certified Public Accountants" ("AICPA"), to "develop[] audit sampling techniques." The clubs made no objections to the Collector's methodology during the assessment proceedings; instead, they protested the amounts estimated were too high and failed to take into account spillage or closures, for example. At trial, they likewise presented no testimony, expert or otherwise, that the block sampling and mark-up analysis used by the Collector failed to follow generally recognized sampling techniques or AICPA standards.

The Collector's audit manager, Ms. Pettis, explained at length how they had reached the assumptions made in the audit and initial assessment, after the clubs indicated they could provide no specific information as to actual sales, other than their bank deposits, which Mr. Vallet admitted did not accurately reflect actual sales or cover charges. Ms. Pettis testified she did research on auditing bars and nightclubs to determine the best assumptions for the mark-up analysis using the purchased inventory: she consulted colleagues; reviewed guidelines such as the California State Board of Equalization Audit Manual for Bars and Restaurants, and the IRS Audit Technique Guide for Bars and Restaurants; was familiar with a presentation by the Louisiana Association of Tax Administrators (LATA) entitled, "Audits of Bars, Lounges and Restaurants"; and consulted online sources such as www.bringingfuntoyou.com to determine how much liquor is poured in a typical drink. Notably, the clubs' CPA was provided with both the California manual and the IRS guidelines before the Notice of Intent to Assess was mailed on January 19, 2010, according to Ms. Pettis. The source for the amount of alcohol in a typical

drink was specifically noted in the January 19, 2010 letter accompanying the Notice of Intent to Assess. Although the trial court ultimately did not allow the introduction of the IRS and California manuals in evidence, the court did allow Ms. Pettis to testify she had consulted these resources in developing the audit and assessment methodology.[10]

Ms. Pettis explained how she had developed a procedure for the audit of the clubs, given the clubs had failed to maintain "suitable records" of "all sales" as required by law. After consulting various sources, the auditors decided to sample the beer and liquor purchase records for the selected months, and estimated three drinks per person to determine cover charges, for the audit and initial assessment. After the hearings before the School Board, the auditors made a number of concessions, based primarily on Mr. Vallet's memory and estimates, such as allowing for dollar nights, determining a percentage for spillage and theft, and allowing adjustments for closure due to hurricanes. In addition, the auditors removed champagne purchases, because the clubs claimed to have always given champagne away, and soft drinks when given to designated drivers. All of these concessions inured to the benefit of the clubs. Ms. Pettis noted the Collector did not, however, make any allowance for "open bar" nights for employees, also described as "self-consumption" in the record, or giveaways of drinks to other persons or organizations, because the clubs could produce no hard records of such.

---

[10] The trial court excluded both manuals from evidence, but allowed the Collector to submit both as Defense Proffers 1 and 2. Citing La. Code Evid. Art. 801(C), the Collector argues the manuals were not hearsay, but were "offered to show that the auditors consulted generally-recognized accounting techniques in developing their assessment, not to prove the truth of the manuals' contents." The Collector notes these manuals have been cited and accepted in other jurisdictions in similar cases involving the audits of bars and restaurants. *See, e.g., Yilmaz, Inc. v. Dir., Div. of Taxation*, 22 N.J. Tax 204, 230 (N.J. Tax Ct. 2005). We note the trial court correctly allowed Ms. Pettis to testify that she had consulted these manuals. We need not reach the issue of whether the trial court erred in also excluding them from evidence, despite the Collector's claim the manuals were relevant to show the Collector had developed a methodology that comported with La. Rev. Stat. 47:337.35(C)(4). As explained infra, it was ultimately the clubs' burden to prove the Collector's "sampling procedure" did not comport with such generally recognized sampling techniques and standards set forth by the AICPA, and the clubs failed to satisfy that burden.

Ms. Pettis also testified regarding the z-tapes that were provided by the clubs for the months of April and May in 2010. She believed the assumptions made by the Collector were "in line" with the results of the actual sales records provided by the clubs, pointing out that in some cases, for example, spillage, the Collector's allowance was higher than actually recorded by the clubs. The clubs and the court of appeal cite the 2010 z-tapes to challenge the accuracy of the Collector's methodology, specifically as it pertained to actual sales and the number of patrons. However, Ms. Pettis explained that the clubs did not provide the inventory purchases for those months, and thus she could not directly compare how the sales amounts actually recorded on the z-tapes correlated with the liquor and beer purchases for those same months. Without the corresponding inventory purchases for the months of the z-tapes, she could not determine whether estimated sales under the Collector's assessment correlated unfavorably with actual sales recorded on the z-tapes.[11] As she explained, she could only compare apples to apples, and the Collector's assumptions as to mark-up and ratio of drinks-per-patron were in-line with the numbers recorded by the z-tapes.

There was no countervailing testimony that the mark-up analysis used by the Collector failed to comply with generally recognized sampling procedures. The clubs point to alleged flaws in the Collector's final assessments that show they were unreliable and unreasonable. They contend the mark-up analysis presented in the LATA publication, "Audits of Bars, Lounges Restaurants," contained a more accurate mark-up analysis, which the Collector should have used rather than the mark-up analysis it actually used. There was no expert testimony that the LATA

---

[11] When questioned as to whether the z-tapes showed the audit technique as being "way off base," Ms. Pettis disagreed and explained: "If I could see [the clubs' beer and alcohol] purchases for that period, that would be a better way to compare. I can't compare sales to sales. If [the clubs'] purchases were more [in 2010] than what they were back then [during 2005-2008], that's a different story. If [the clubs'] purchases were less, then the bottom line is [the club] made the purchases of this alcohol and [they] sold it."

analysis cited by the clubs was more in line with generally recognized sampling techniques or that it complied with AICPA guidelines, while the Collector's method did not. Next, they contend the z-tapes for April and May 2010 demonstrated the inaccuracies in the Collector's assumptions and assessment, but Ms. Pettis explained that the 2010 data generally confirmed assumptions the Collector had made, and in other respects were not comparable to the data necessarily reviewed by the Collector because the clubs lacked adequate records of sales and cover charges.

In short, it was the clubs' burden to overcome the *prima facie* correctness of the Collector's assessment, in light of La. Rev. Stat. 47:337.28(A), and to prove the block sampling and mark-up analysis used by the Collector failed to comply with generally recognized sampling procedures, under La. Rev. Stat. 47:337.35(C)(3). While the clubs object to specific percentages and assumptions used by the Collector, the fact remains they failed to keep any records for the subject tax period, 2005-2008, showing their actual drink sales, cover charges, or the amounts paid to bands or security, much less amounts due to spillage, theft, giveaways, or open bar nights. Additionally, there was no testimony presented by the clubs' own CPA either that the sources consulted by the Collector or the methodology used by the Collector did not comport with "[g]enerally recognized sampling techniques and standards set forth by the American Institute of Certified Public Accountants." Indeed, there is no indication in the record, nor have the clubs directed our attention to such evidence, as to what the AICPA standards might require that the Collector allegedly failed to follow. We thus conclude the clubs failed to show the Collector's assessment was not in compliance with the law. *See* La. Rev. Stat. 47:337.28.1(A).

27

Because of our findings above, we find merit to the Collector's assertion the trial court necessarily erred in granting attorney fees to the clubs as the "prevailing party" pursuant to La. Rev. Stat. 47:337.13.1(B)(1). "The prevailing party is defined as the party which has substantially prevailed with respect to the amount in controversy or substantially prevailed with respect to the most significant issue or set of issues presented. A position is substantially justified if it has a reasonable basis in law and fact." La. Rev. Stat. 47:337.13.1(B)(1). Because the clubs are not the prevailing party following our decision today within the meaning of this provision, they are not entitled to reimbursement of attorney fees and costs.

We next turn to the issue of prescription for tax years 2005 and 2006 for Yesterdays. After trial had commenced, Yesterdays filed an "Amended Petition For Refund," asserting prescription for the tax years 2005 and 2006. Yesterdays' Amended Petition For Refund was precipitated by discussions between counsel that revealed the Collector was no longer in possession of a document entitled "Agreement to Suspend Prescription of Sales and Use Taxes Administered by the Calcasieu Parish School Board," also referred to as the waiver or suspension agreement, executed for Yesterdays. This agreement purported to suspend the prescriptive period for Yesterdays for the tax years 2005 and 2006 until December 31, 2010; however, the document could no longer be found in the trial record.

The applicable law provides that taxes, except real property taxes, and licenses shall prescribe in three years after the thirty-first day of December in the year in which they are due, but prescription may be interrupted or suspended as provided by law. La. Const. art. VII, § 16; *see also* La. Rev. Stat. 47:337.67(A). Therefore, any taxes, penalties, or interest claimed by the Collector as against Yesterdays for the year 2005 prescribed on December 31, 2008, and any taxes,

penalties, or interest claimed for the year 2006 prescribed on December 31, 2009. Here, the Notice of Intent to Assess was issued on January 19, 2010, and the Notice of Assessment 60-Day Notice was issued on July 10, 2010; accordingly, the taxes, penalties, and interest for years 2005 and 2006 were prescribed on their face. The burden, therefore, fell on the Collector to prove the prescriptive period had been interrupted or suspended. The peremptory exception of prescription may be filed at any stage of the proceeding in the trial court prior to submission of the case for a decision. La. Code Civ. Proc. art. 928(B). Yesterdays thus timely raised the issue of prescription. The trial court sustained the exception of prescription, and the court of appeal affirmed. We find no error in the trial court's ruling for the following reasons.

In this court, the Collector argues three bases for finding the trial court erred in sustaining the exceptions. First, the Collector asserts it proved the existence and contents of the missing document under La. Code Evid. art. 1004, which permits testimony to prove the contents of a document that has been lost. That article provides that an original is not required, "and other evidence of the contents of a writing, recording, or photograph is admissible if …[a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith…." The Collector contends both clubs signed the waiver agreements and that counsel for the clubs "tacitly acknowledged during trial and confirmed post-trial that the last suspension agreement between the School Board and Yesterdays had been lost." However, we can find no sworn testimony or evidence in the record regarding the contents of the lost document. At most, counsel for the clubs acknowledged on two occasions, when discussing the amended petition and the issue of prescription, that the document purporting to be a waiver of prescription between the Collector and

29

Yesterdays had been lost. We do not find this to be sufficient testimonial evidence as to the contents of the lost document.

Second, the Collector suggests the dissent below properly concluded Yesterdays made a judicial confession pursuant to La. Civ. Code art. 1853 in its petition as to the "tax period in question" being years 2005-2008, thereby admitting that taxes for that period had not yet prescribed.[12] We disagree that Yesterdays made a judicial confession with respect to the suspension of prescription. In *Traina v. Sunshine Plaza, Inc.*, 03-1003, p. 6 (La. 12/3/03), 861 So.2d 156, 160, this court explained that "a judicial confession has the effect of waiving evidence relating to the subject matter of the admission and withdrawing the subject matter of the confession from issue." However, a judicial confession must be explicit and cannot be implied. *Collins v. State Farm Ins. Co.*, 14-0419 (La. App. 4 Cir. 2/14/15), 160 So.3d 987. Although the petition certainly refers to the subject tax period in question, specifying years 2005-2008, we do not find the language of the petition expressly acknowledges the existence of an agreement to suspend prescription, nor does it expressly waive prescription as to years 2005 and 2006 for Yesterdays. That the Collector presumably intended to rely on the suspension agreement it allegedly executed with Yesterdays for those tax years is of no moment. Accordingly, we find no merit to the Collector's argument in that regard.

Third, the Collector contends prescription was interrupted during each month of the four-year audit period, including years 2005 and 2006, by the clubs' filing of false or fraudulent sales tax returns for each and every month during the

---

[12] Louisiana Civil Code Article 1853 defines judicial confession as follows:

> A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it. A judicial confession is indivisible and it may be revoked only on the ground of error of fact.

period. Under La. Rev. Stat. 47:337.67(B)(4), the Collector asserts, filing a false or fraudulent return interrupts prescription. However, the trial court clearly found no intent on the part of the clubs to defraud the Collector of taxes due. *See* La. Rev. Stat. 47:337.75, referenced in note 6, *supra*. We find no basis in the record to disturb the trial court's factual determination. The clubs' owner testified that he had calculated and filed his tax reports in the same manner for over twenty-two years, and that his failure to include taxes for the cash amounts disbursed for security, bouncers, and bands was merely an honest mistake. The trial court obviously accepted that testimony, and the Collector has not directed our attention to any evidence in the record to upset the trial court's credibility determination. Accordingly, we find no error in the ruling sustaining the exception of prescription for years 2005 and 2006 for Yesterdays.

Last, we turn to the Collector's assertion the trial court erred in denying its motion for new trial on peremptory grounds under La. Code Civ. Proc. art. 1972, because the Collector "discovered, since the trial, evidence important to the cause, which [it] could not, with due diligence, have obtained before or during the trial." In its motion for new trial, the Collector asserted newly-discovered records kept by the Sheriff's Department showed the clubs had grossly underestimated the cash sums paid to the off-duty sheriff's deputies for security during the years 2005-2008. However, because we reverse the trial court's judgment in favor of the Collector, by finding the clubs failed to show that the methodology used by the Collector was not in compliance with the law, the Collector's motion for new trial based on newly-discovered evidence is necessarily moot.

**CONCLUSION**

In sum, we hold La. Rev. Stat. 47:337.29(A)(1) is clear and unambiguous, contrary to the trial court's ruling. The statute clearly provides that for the purpose of reporting and paying sales taxes, the dealer must "keep and preserve suitable records of the sales...and such other books of accounts as may be necessary to determine the amount of tax due hereunder…." La. Rev. Stat. 47:337.29(A)(1). The lower courts erred in finding ambiguity in this language and placing upon the Collector the burden of proving the bank statements and deposit slips presented by the clubs were not "suitable records." Applying *de novo* review, we find the clubs failed to show the bank statements and deposit slips alone were "suitable records" of "all sales" as required by law, when at best they were evidence of net sales.

We further hold the trial court erred in finding "the Collector's arbitrary tax calculation methodology was improper." First, we hold La. Rev. Stat. 47:337.28.1 applies in this case because the clubs failed to provide "suitable records" as required by La. Rev. Stat. 47:337.29. Therefore, the Collector's assessment could not be deemed "arbitrary," and the clubs bore the burden of proving the assessment was not in compliance with the law. La. Rev. Stat. 47:337.28.1(A). Next, we hold there is no requirement in La. Rev. Stat. 47:337.35(B) that the agreement between the taxpayer and the collector to use a particular sampling procedure must be in writing to be binding. Furthermore, we find the audit package and the notice of intent to assess, along with the accompanying letter, were sufficient to inform the taxpayer in writing of the sampling procedure the Collector intended to use to project the findings of the audit and establish a tax liability. Thus, under both La. Rev. Stat. 47:337.28.1(A) and La. Rev. Stat. 47:337.35(C), the clubs bore the burden of demonstrating any sampling procedure used by the Collector was not developed or applied in accordance with generally recognized sampling techniques. La. Rev. Stat. 47:337.35(C)(3).

Based on our *de novo* review of the record, we find the clubs failed to carry their burden of proving the assessment was not in compliance with the law. La. Rev. Stat. 47:337.28.1(A). The Collector was required to make an assessment, and because the clubs clearly failed to produce suitable records of actual sales or cash disbursements to sheriff's deputies, bouncers, or bands, or keep a record of the number of patrons in the bars, the Collector was allowed to use a "block sampling" procedure and a "mark-up analysis" of liquor and beer sales purchased for resale by the clubs. The clubs agreed to the methodology chosen by the Collector, and while the clubs provided additional information during the assessment proceeding, which resulted in the modifications of initial assumptions made by the Collector and reductions in the assessed tax due, the clubs failed to establish the "sampling procedure" and mark-up analysis of the inventory purchase records used by the Collector were neither developed nor applied in accordance with generally recognized sampling techniques. La. Rev. Stat. 47:337.35(C)(3).

**DECREE**

For the foregoing reasons, we reverse in part the court of appeal's decision affirming the trial court's judgment, affirm that decision in part, and remand to the trial court. More specifically, we reverse the trial court's judgment ordering a refund of the taxes and interest paid under protest by the clubs. We further reverse the trial court's award of attorney fees. In all other respects, the judgment of the trial court is affirmed. The matter is remanded to the trial court to calculate the amount of taxes, interest, and penalties due the Collector and to render judgment consistent with this opinion.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED**